WAMSER, Appellant, vs. WAMSER, Respondent.

*September 12—October 11, 1949.*

For the appellant there was a brief by *Rubin & Ruppa* of Milwaukee, and oral argument by *Nathan Ruppa.*

For the respondent there was a brief by *Stern & O'Brien* of Milwaukee, and oral argument by *John M. O'Brien*.

FRITZ, J.   Plaintiff contends that the court erred in determining that the value of the defendant's estate is $54,028.43; and that the award of about one third thereof as a final division of his estate, without any order for further alimony, constitutes an abuse of discretion and results in an injustice to her.   In connection with these contentions she claims that the value of defendant's estate is in excess of $150,000, and his annual income is in excess of $10,000.

On the other hand, defendant contends (1) that his gross annual income is $10,400, which, after deducting $1,496.70 withheld as federal income taxes, leaves him $8,903.30, and that his state income tax approximates $132, and in addition he pays $600 a year for the support of a minor daughter by a prior marriage, and is obligated to pay $3,000 a year and interest on a bank loan, and his annual insurance premiums aggregate $2,014, so that he has left about $3,150 annually; and (2) that $54,028.43 is,—as the court determined,—the total gross value of all defendant's assets, which are the following: A homestead, the net value of which after deducting a mortgage loan of $3,120, is $11,380; furniture, costing between $5,000 and $6,000 but depreciated to $2,000; automobile, $500; net worth of other assets (primarily corporate stocks), $40,148.43.   (Title to the homestead was in defendant until an interest in joint tenancy was conveyed to plaintiff.)

In the final division of defendant's estate the following assets and benefits were awarded to plaintiff, to wit:

| | |
|---|---:|
| Homestead valued at | $14,500.00 |
| Household furnishings | 2,000.00 |
| Automobile | 500.00 |
| Cash | 4,000.00 |
| Defendant to pay part of taxes on homestead | 486.60 |
| and debts on unauthorized bills contracted by plaintiff | 583.54 |
| Total | $22,070.14 |

In addition the judgment ordered defendant to pay:

| | |
|---|---:|
| Mortgage debt on the homestead | $3,120.00 |
| On plaintiff's debts to her attorneys herein | 1,750.00 |
| Total | $26,940.14 |

Furthermore, since the commencement of the action, the defendant was required to pay plaintiff temporary alimony of $175 per month; and she occupied the home rent free, and defendant was required to pay the taxes, heating and public utility bills, medical and dental bills, and charge accounts incurred by her to the time of the trial of $1,472.

Prior to the marriage of the parties on December 15, 1937, the defendant had been married and divorced twice, and he had three adult married children, and also a minor daughter supported by him. Before the parties were married, on December 14, 1937, they entered into an antenuptial contract in which it was stated that defendant has four children by his former marriages, and that the parties recognize and desire that his legal and moral obligations to said children shall not be unduly prejudiced by the contemplated marriage of the parties; and the contract provided that in the event the defendant died or the parties were separated within three years after marriage, Rosalyn Wamser was to receive ten per cent of defendant's estate; and if either contingency happened after three years of marriage, plaintiff would take a share equal to each of defendant's children. The antenuptial contract was canceled on November 30, 1943.

In 1943 and again in 1944 plaintiff commenced actions for divorce, which were dismissed after the parties became reconciled, and in connection therewith the joint-tenancy interest in the homestead was conveyed to plaintiff. The present action was commenced in June, 1947. At the time of the trial plaintiff was thirty-seven years of age, and defendant's age was fifty-seven years. For over twenty-one years he has been engaged in the electric-sign business, and for the conduct thereof he organized and was the principal officer of three

corporations, the Everbrite Electric Signs, Inc., the Everbrite Electric Service Company, and the Everbrite Investment Company, and owned and held all of their capital stock except the necessary qualifying shares issued to the other officers. On December 18, 1943, he made gifts and transfers of fifty-five shares of his Everbrite Electric Service Company stock, thirteen shares of his Everbrite Investment Company stock, and thirteen shares of his Everbrite Electric Signs Company stock to each of his three adult children; and likewise on March 9, 1944, he made gifts and transfers of thirty shares of his Service Company stock, ten shares of his Investment Company stock, and fifteen shares of his Electric Signs Company stock to each of said children. In relation to those transfers the court stated in its written decision and its findings of fact and conclusions of law that the transfers resulted from *bona fide* gifts fully consummated and thereafter recognized as such for reasons within the letter and spirit of the recitals in the antenuptial contract of December 14, 1937, between plaintiff and defendant; that she failed to attack those transfers in two former divorce suits which were dismissed, and those transfers stood unattacked until she commenced the present action for divorce on June 21, 1947; that the transfers were not in fraud of any right of plaintiff, and that as the result of these transfers the number and total value of his remaining shares of stock still owned by defendant at the time of the trial were reduced accordingly.

Upon our review of the record it is evident that the court's findings and conclusions of law to the above-stated effect were clearly warranted by evidence which the court could consider credible, and that as they are not contrary to the clear preponderance of the evidence they must be sustained. Plaintiff, in claiming that the transfers were not *bona fide,* but were fraudulent, relies upon the fact that in two financial statements signed by defendant, which were required by the bank at which loans had been obtained on which he was personally liable,

there were listed, as assets owned by him, shares of stock in the three corporations named above, which were stated to have an aggregate market value of $76,500 in the statement dated December 19, 1945, and of $113,000 in the statement dated December 31, 1945. The values thus stated would be considerably in excess of the value of defendant's remaining holdings of such shares if the above-stated transfers thereof to three of his children on December 18, 1943, and March 9, 1944, were *bona fide* and valid. However, in relation to those amounts stated as the value of the stock listed in said financial statements, there is testimony, which the court could and evidently did consider credible, by Benjamin Welch, the bookkeeper of said three corporations, that by his mistake he included in the said statements the value of all the shares which defendant owned before he made said transfers thereof to his children on December 18, 1943, and March 9, 1944, respectively. Welch testified that he did not think those statements were going to be used for credit purposes, but just followed the same procedure they did before defendant made the transfers; that Welch erred in neglecting to remember that defendant had made the transfers; and that he did not tell defendant before he signed the statements that the figures were erroneous. Futhermore, Welch testified that in Exhibit 72 (introduced in evidence), which is a financial report prepared by him, there are truly reflected the book values of all of defendant's stockholdings on December 31, 1947, in four corporations, to wit :

| | |
|---|---:|
| 33 shares of Everbrite Electric Signs Company | $14,656.95 |
| 80 shares of Everbrite Electric Service Company | 9,381.60 |
| 28 shares of Everbrite Investment Company | 8,718.92 |
| 90 shares of Porcelain Building Products Company | 103.50 |
| Total | $32,860.97 |

In a report made by William S. Schmidt, a public accountant employed by one of plaintiff's attorneys to check the property holdings of defendant, Schmidt listed in his report that on

December 31, 1946, the book value of the stock held by defendant was,—

$ 6,986.40 for 80 shares of Everbrite Electric Service
         Company
6,275.08 for 28 shares of Everbrite Investment Company
11,908.38 for 33 shares of Everbrite Electric Signs Company

$25,169.86     Total

Thus, in view of said testimony and reports by those accountants as to the number of shares held by the defendant in the three Everbrite corporations, and as to their conclusions in respect to the values thereof, and in view of the conflicts in the testimony of other witnesses called by the respective parties to testify in relation to the value of the real estate owned by the Investment Company, it is evident that the court was warranted in finding that $40,148.43 was the net worth of the defendant's estate otherwise than the homestead, furniture, and automobile.

Under the facts and circumstances established by the evidence, it was within the discretion and province of the court to adjudge said final division of defendant's estate in lieu of allowing any further alimony to plaintiff. Her physician testified that she has been consulting him as her physician since two years after her marriage,—but at first because of injuries received in an automobile accident. In August, 1943, he treated her for migraine headaches; and since then he has examined and treated her frequently. In July, 1947, he found that at irregular intervals she had extra beats of the heart,— which is not too unusual,—with enlargement thereof, and a narrow rise in the impulse of the heart muscle, plus low voltage, indicating probably mild cardial damage, and an insufficiency or leakage of the mitral valve. He prescribed treatment only in so far as she should take it easy and limit her activities, avoid all emotional stresses and strains, and have proper rest. He has not given her any medication, with the

exception of high vitamin B and a sedative to cut down the emotional tension. He testified also that if the load, or the emotional stresses were relieved, under proper environment and prolonged rest, she would, in possibly six months to a year be able to throw a good share of this off, because migraine attacks are predicated in the main upon stresses almost entirely; that as far as Mrs. Wamser's extra heart beats are concerned,—a good many people have that, and some are asymptomatic, they do not cause symptoms; and that a good many of them still continue to do their work.

Prior to plaintiff's marriage to defendant in December, 1937, she was steadily employed as a bookkeeper and office worker and earned from $46 to $60 a week during even the depression years. And the evidence in relation to her ability and earning capacity as a bookkeeper or office worker, and in relation to the improvement of her health within six months to a year, warranted the court's findings and conclusions that because of the award to her of a substantial portion of defendant's estate, in addition to the other payments ordered to be made for her benefit, she was not entitled to any further alimony.

*By the Court.*—Judgment affirmed.